1

2

3

4

5                          UNITED STATES DISTRICT COURT

6                         NORTHERN DISTRICT OF CALIFORNIA

7

8    LUKE E. OLIVER,                              No. C 07-2233 MHP (pr)

9              Petitioner,                        **ORDER DENYING HABEAS
                                                  PETITION**
10        v.

11   ROBERT AYERS, warden,

12             Respondent.
     _____/

13

14                              **INTRODUCTION**

15        Luke E. Oliver, formerly an inmate at San Quentin State Prison and now an inmate at

16   Chuckawalla Valley State Prison, filed this pro se action seeking a writ of habeas corpus

17   under 28 U.S.C. § 2254.  This matter is now before the court for consideration of the merits

18   of the pro se habeas petition.  For the reasons discussed below, the petition will be denied.

19                              **BACKGROUND**

20        Oliver was convicted in San Francisco County Superior Court of first degree murder,

21   rape by threat, sodomy, kidnapping, robbery and assault with intent to commit rape.  For

22   those convictions, he was sentenced to 7 years to life in prison in 1971.  His habeas petition

23   does not challenge his conviction but instead challenges a June 2, 2006 decision by Governor

24   Arnold Schwarzenegger to reverse the decision of the Board of Parole Hearings ("BPH"),

25   and find him not suitable for parole.

26        The Governor identified the circumstances of the commitment offense, Oliver's

27   history of violent sexual offenses, and a "not entirely supportive" mental health evaluation as

28   the reasons for his decision that Oliver's release would pose an unreasonable risk of danger to

     society.  Resp. Exh. 4 at 3.

*United States District Court*
*For the Northern District of California*

Oliver sought relief in the California courts. The San Francisco County Superior Court denied his petition for writ of habeas corpus in a reasoned decision. Resp. Exh. 9. The California Court of Appeal and California Supreme Court summarily denied his petition for writ of habeas corpus.

Oliver then filed his federal petition for a writ of habeas corpus. The court found cognizable his claim that his right to due process was violated because the evidence was insufficient to support the Governor's decision that he was unsuitable for parole. Respondent filed an answer and Oliver filed a traverse. The parties also filed supplemental briefs after the en banc decision in <u>Hayward</u> was issued.

## JURISDICTION AND VENUE

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged action concerns the execution of the sentence of a prisoner then housed at a prison in Marin County, within this judicial district. 28 U.S.C. §§ 84, 2241(d).

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. <u>See</u> 28 U.S.C. § 2254(b), (c). The parties do not dispute that state court remedies were exhausted for the claim asserted in the petition.

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law,

as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); see Williams (Terry) v. Taylor, 529 U.S. 362, 409-13 (2000).   Section 2254(d) applies to a habeas petition from a state prisoner challenging the denial of parole.  See Hayward v. Marshall, 603 F.3d 546, 563 (9th Cir. 2010) (en banc); Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006).

**DISCUSSION**

A.      State Law Standards For Parole For Murderers In California

California uses indeterminate sentences for most non-capital murderers, with the term being life imprisonment and parole eligibility after a certain minimum number of years. Today, a first degree murder conviction yields a minimum term of 25 years to life and a second degree murder conviction yields a minimum term of 15 years to life imprisonment. See In re Dannenberg, 34 Cal. 4th 1061, 1078 (Cal. 2005); Cal. Penal Code § 190.  At the time Oliver committed the murder in this case, the minimum tem before parole eligibility was seven years.

A BPH panel meets with an inmate one year before the prisoner's minimum eligible release date "and shall normally set a parole release date. . . . The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates." Cal. Penal Code § 3041(a).  Significantly, that statute also provides that the panel "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." Cal. Penal Code § 3041(b).  California law adds a layer of review by giving the Governor the power to review the BPH decision and to affirm, modify or reverse the decision but only on

the basis of the same factors the parole authority is required to consider.  <u>See</u> Cal. Penal Code § 3041.2; Cal. Const. art. V, § 8(b).   Although the Governor must consider the same factors as the BPH, his review is an "independent, de novo review," and he therefore "has discretion to be 'more stringent or cautious' in determining whether a defendant poses an unreasonable risk to public safety."   <u>In re Shaputis</u>, 44 Cal. 4th 1241, 1258 (Cal. 2008)

Under the regulations applicable to Oliver, as a parole applicant who committed a murder before November 7, 1978, a parole date shall be denied if the prisoner is found to be unsuitable under § 2281(c) and shall be set if the prisoner is found to be suitable under § 2281(d).  15 Cal. Code Regs. § 2280.  "The panel shall first determine whether a prisoner is suitable for release on parole.  Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." 15 Cal. Code Regs. § 2281(a).  The panel may consider all relevant and reliable information available to it.  15 Cal. Code Regs. § 2281(b).

The regulations contain matrices of suggested base terms for several categories of crimes, including first degree murder.  <u>See</u> 15 Cal. Code Regs. § 2282.  For example, for first degree murders, the matrix of base terms ranges from a low of 8, 10, or 12 years to a high of 18, 20, or 22 years, depending on some of the facts of the crime.  However, the statutory scheme places individual suitability for parole above a prisoner's expectancy in early setting of a fixed date designed to ensure term uniformity.  <u>Dannenberg</u>, 34 Cal. 4th at 1070-71.  The matrix is not reached unless and until the prisoner is found suitable for parole.  <u>Id.</u> at 1070-71; 15 Cal. Code Regs. § 2282(a) ("[t]he panel shall set a base term for each life prisoner who is found suitable for parole").

The "Penal Code and corresponding regulations establish that the fundamental consideration in parole decisions is public safety . . . [T]he core determination of 'public safety' under the statute and corresponding regulations involves an assessment of an inmate's <u>current</u> dangerousness."  <u>In re Lawrence</u>, 44 Cal. 4th 1181, 1205 (Cal. 2008) (emphasis in source).   Where "evidence of the inmate's rehabilitation and suitability for parole under the

4

1   governing statutes and regulations is overwhelming, the only evidence related to unsuitability

2   is the gravity of the commitment offense, and that offense is both temporally remote and

3   mitigated by circumstances indicating the conduct is unlikely to recur, the immutable

4   circumstance that the commitment offense involved aggravated conduct does not provide

5   'some evidence' <u>inevitably</u> supporting the ultimate decision that the inmate remains a threat to

6   public safety." <u>Id.</u> at 1191 (emphasis in source).

7   B.     <u>Federal Habeas Relief On Parole Denial Claims</u>

8          The U. S. Constitution's Due Process Clause does not itself provide state prisoners

9   with a federal right to release on parole. <u>Hayward</u>, 603 F.3d at 561.  The substantive law of a

10  state might create a right to release on parole, however. <u>See id.</u> at 555, 559.  Although

11  <u>Hayward</u> purported not to reach the question whether a California's substantive law created a

12  federally protected liberty interest, <u>see id.</u> at 562, later cases from the Ninth Circuit have said

13  or assumed it does.   <u>See</u> <u>Pearson v. Muntz</u>, 606 F.3d 606, 609 (9th Cir. 2010) ("state-created

14  rights may give rise to liberty interests that may be enforced as a matter of federal law. . . .

15  By holding that a federal habeas court may review the reasonableness of the state court's

16  application of the California 'some evidence' rule, <u>Hayward</u> necessarily held that compliance

17  with the state requirement is mandated by federal law, specifically the Due Process Clause."

18  ); <u>Cooke v. Solis</u>, 606 F.3d 1206, 1213 (9th Cir. 2010) ("In <u>Hayward</u>, we held that due

19  process challenges to California courts' application of the 'some evidence' requirement are

20  cognizable on federal habeas review under AEDPA"); <u>id.</u> ("we must examine the nature and

21  scope of the federally enforceable liberty interest created by California's 'some evidence'

22  requirement"); <u>see also</u> <u>Pirtle v. California Board of Prison Terms</u>, 611 F.3d 1015, 1020 (9th

23  Cir. 2010) ("'California's parole scheme gives rise to a cognizable liberty interest in release

24  on parole.' <u>McQuillion v. Duncan</u>, 306 F.3d 895, 902 (9th Cir 2002).  That liberty interest

25  encompasses the state-created requirement that a parole decision must be supported by 'some

26  evidence' of current dangerousness. <u>Hayward</u> [603 F.3d at 562-63.]")   <u>Hayward</u>'s

27  application and these later cases make it clear that in the Ninth Circuit there is federal habeas

28  relief available under §2254 for California prisoners denied parole without sufficient

1   evidence, although it now appears that the emphasis has shifted from § 2254(d)(1) to §

2   2254(d)(2).

3         A federal district court reviewing a California parole decision "must determine

4   'whether the California judicial decision approving the governor's [or the Board's] decision

5   rejecting parole was an 'unreasonable application' of the California 'some evidence'

6   requirement, or was 'based on an unreasonable determination of the facts in light of the

7   evidence.'" Hayward, 603 F.3d at 562-63 (quoting 28 U.S.C. § 2254(d)(1)-(2)).  That

8   requirement was summarized in Hayward as follows:

9         As a matter of California law, "the paramount consideration for both the Board
          and the Governor under the governing statutes is whether the inmate currently
10       poses a threat to public safety."  There must be "some evidence" of such a
          threat, and an aggravated offense "does not, in every case, provide evidence
11       that the inmate is a current threat to public safety."  The prisoner's aggravated
          offense does not establish current dangerousness "unless the record also
12       establishes that something in the prisoner's pre- or post- incarceration history,
          or his or her current demeanor and mental state" supports the inference of
13       dangerousness.  Thus, in California, the offense of conviction may be
          considered, but the consideration must address the determining factor, "a
14       current threat to public safety."

15   Hayward, 603 F.3d at 562 (footnotes omitted) (quoting Lawrence, 44 Cal. 4th. at 1210, 1213-

16   14); see also Cooke, 606 F.3d at 1214 (describing California's "some evidence"

17   requirement).

18         When a federal court considers a habeas case directed to a parole decision, the

19   "necessary subsidiary findings" and the "ultimate 'some evidence' findings" by the state

20   courts are factual findings – and thus are reviewed by the federal court under 28 U.S.C. §

21   2254(d)(2) for whether the decision was "based on an unreasonable determination of the

22   facts in light of the evidence."  Cooke, 606 F.3d at 1216 (citing Hayward, 603 F.3d at 563).

23   C.    Oliver's Case

24       1.    His Circumstances

25         One day in 1970, Oliver laid in wait for his neighbor and then raped and murdered

26   her.  "While armed with a butcher knife, he grabbed her around her neck and forced her into

27   the basement of the apartment building where he raped and sodomized her.  Oliver had tied a

28   cord around the victim's legs and neck.  When the victim began to struggle, Oliver strangled

her to death." 1/10/2006 BPH hearing reporter's transcript ("RT"), 14-15. At his parole hearing, Oliver said that he was "acting out [his] aggression towards [his] marriage, had been drinking very heavily that day, saw the victim, and decided to take his aggression out on her. RT 15-16. Before that day, she was "nice," but he believes she may have rejected his advances toward her that day. RT 16. Oliver has maintained that he did not intend to kill the victim but only to silence her by laying on top of her and cupping her mouth when she started screaming; however, as a previous panel member observed, her death was almost inevitable when Oliver rested his weight on her, given that he had tied a cord from her ankle to around her neck. See 6/2/04 RT 61. The Governor noted that Oliver's contention that the death was an accident showed "limited insight into the circumstances of this offense." Resp. Exh. 4 at 3.

The rape that led to the killing was Oliver's fifth sexual assault of a female. The mental health evaluation recounted four other sexual assaults. Even though they did not all result in convictions, the inmate described the conduct – and it is his conduct rather than the punishment that would be relevant to dangerousness. His first assault occurred when he was 14 years old and was his first sexual encounter. He was at a party where there was a girl in another room. His friends told him "they were going to, 'pull a train on her.' This meant that they would have sex with her in serial fashion, presumably against her will. Mr. Oliver participated in this process and enjoyed the sexual aspect." Resp. Exh. 7 at 1-2. His second sexual assault was when he was 15 years old and was against a girl he was dating. "[T]he first time they had had sex, the inmate 'twisted her arm.' His group of friends instructed him that was the way to convince her to have sex. It was pleasurable for the inmate to witness this woman's humiliation during sex." Id. at 2. They continued to date, apparently, as he reported that "[n]ot all of their sexual encounters involved coercion or humiliation but would occasionally do so when Mr. Oliver wanted sex and his girlfriend was not cooperating." Id. His third sexual assault was when he was 20 years old and "forced himself sexually upon" his friend who was a prostitute. "When the act was over, he discovered that she had taken his wallet, which made him very angry. He reports that he had a gun at the time and after

tracking her down, fired a shot over her head." Id.  His fourth sexual assault occurred when he was 21 years old.  Oliver and a friend met a 13-year old and another girl in San Francisco. "He tried to pick up the two girls with his cousin but they refused.  He then forced the two of them in the car and took them to lover's lane.  When they parked the car, him (sic) and his cousin ripped their clothes off and forced themselves upon them." Id.  Additionally, although not noted in the mental health evaluation, the Governor noted that Oliver had yet another attempted sexual assault: Oliver had forced a woman at gunpoint into his car, forced her to lie on the floor of the car, pointed a gun at her head while telling her she would have sex with him, and forced her into the trunk; that victim escaped after being held for about six hours. Resp. Exh. 4 at 1; see Resp. Exh. 10 at Ex. D, p. 4 (initial parole consideration report recounting Oliver's criminal history, including this incident).

The 2004 mental health evaluation indicated some problems, even though the evaluator ultimately rated Oliver as having a "low" risk of violence and a "low to low-moderate risk" of "sexually reoffending."  Resp. Exh. 7.  The clinician listed an Axis I diagnosis of "sexual sadism, in remission" (as well as "alcohol abuse, in institutional remission" and "nicotine dependence"), and an Axis II diagnosis of "antisocial personality disorder." Id. at 5.  With regard to the sexual sadism, the evaluating psychiatrist stated that Oliver "merits a diagnosis of Sexual Sadism as revealed in his criminal history and interview."  The criminal history includes the rape-murder plus the four sexual assaults. Oliver had told the clinician that the "humiliation and degradation of other (sic) had sexually aroused him in the past but does not do so now." Id. at 2.  Oliver was given a test that measured sexual attitudes towards rape, and gave four "concerning responses" that were suggestive of "cognitive distortions" that "typically arise out of an attempt to self-justify rape behavior and tend to be persistent over time." Id. at 3.[1]  The clinician's final comments were more concerning than comforting:

> Curiously, previous evaluators have never raised the question of a diagnosis of Sexual Sadism, which I raise now.  This past history of this diagnosis in and of itself should not be used as the sole grounds to deny parole.  By any available definition, the disorder is in remission *though this may be a product of lack of access to victims* but more likely, it is because the inmate has made significant efforts in self-change and self-satisfaction and barring any further information, he is likely at low to low-

1    moderate future risk for this specific behavior.

2    Id. at 8 (emphasis added).

3         Oliver had a quite favorable post-incarceration history.  Although he had two

4    CDC-115s, – one for possession of marijuana/hashish in 1984 and one in 1971 for throwing

5    burning papers from his cell -- and spent eight months in administrative segregation in 1971-

6    72 "when he was identified as one of the more aggressive revolutionary leaders of the Black

7    Panther Party," Resp. Exh. 4 at 2, those blotches on Oliver's record had occurred more than

8    twenty years before the Governor determined he was unsuitable.   Oliver had programmed

9    extremely well: he had earned a GED in 1978 and obtained an AA degree in 2001; had

10   pursued several vocations; had worked in various occupations in the prison; had excellent job

11   reviews; and had participated in many self-help and therapy programs.   He also had realistic

12   parole plans to reside with his wife and planned to do property maintenance and management

13   for several properties his wife owned.

14        2.    Governor's Decision And State Court Review

15        The Governor relied on the "especially grave and atrocious life crime and his history

16   of violent, sexual offenses," as well as Oliver's "not entirely supportive" mental health

17   evaluations in determining that Oliver's release "would continue to pose an unreasonable risk

18   of danger to society if paroled at the time."  Resp. Exh. 4.   The Governor (like the BPH),

19   recognized that this inmate had numerous positive attributes, but (unlike the BPH) found

20   them not to outweigh the circumstances that indicated Oliver was not suitable for parole.

21        The San Francisco County Superior Court upheld the Governor's decision in a

22   reasoned decision.  As the last reasoned decision from a state court, that is the decision to

23   which § 2254(d) applies.  See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v.

24   Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005).   The superior court found that some

25   evidence did support the Governor's conclusion that Oliver was not suitable for parole based

26   on the applicable factors.  Resp. Exh. 6 at 3.  The Governor's 3-page decision "specifically

27   finds that there is some evidence supporting four of the six unsuitability factors enumerated"

28   in 15 Cal. Code Regs. § 2402(c).   Id. at 4.   The Governor's finding that Oliver had a

9

previous record of violence also was supported by the record; "[i]ndeed, despite the fact that he was only 23 years old at the time of his conviction[, he] already had a troubling history of violent sexual assaults." Id. at 5.  The court also found some evidence to support the finding of serious misconduct while in prison, although the court did note that the misconduct occurred more than two decades earlier. Id. at 6.  The court also noted that the Governor had mentioned the concerns expressed by the mental health evaluator.  The court explained that the Governor had permissibly relied "not only on the commitment offense, but also on [Oliver's] significant criminal history." Id. at 9.

            3.    Analysis Of Habeas Claim

        The superior court focused on the evidentiary support for the circumstances listed in the regulations and not on whether the evidence was probative on the ultimate question of current dangerousness.  In doing so, the superior court followed an approach taken by many California courts as an interpretation of earlier California Supreme Court precedent, but that was an approach later rejected by Lawrence, 44 Cal. 4th at 1209-12.  After Lawrence, it is clear that the reviewing court does not merely search to find some evidence to support the parole authority's determination that the factors listed in the regulation are present, but also to see if there is some evidence that the inmate poses a current threat to public safety. Id. at 1210.  The superior court's failure to make that latter inquiry does not require that parole be granted.   That is, the writ would not be granted as a bonus for a mistake by a state court on a collateral review but instead only would be granted if there was a constitutional violation.  The constitutional right is the right to be paroled absent some evidence of current dangerousness, and is not the right to be paroled absent a correct state court decision.  For habeas relief to be granted in this case, there would have to be less than some evidence to support the Governor's factual findings and that those facts are probative to the central issue of current dangerousness.  The Governor's decision has the necessary support in Oliver's case.

        The Governor determined that the commitment offense was "especially grave and atrocious," that Oliver had a history of violent sexual offenses, and that the mental health

1   evaluation was not entirely supportive.   Resp. Exh. 4 at 3.  There was some evidence to

2   support each of those findings.  Further, those circumstances were probative of and provided

3   reliable evidence of Oliver's current dangerousness.  Even though the sex offenses were

4   committed more than three decades earlier, Oliver's sexual sadism still raised a red flag for

5   the mental health evaluator in 2004.  The three circumstances combined had a reasonable

6   nexus to the ultimate determination made by the Governor.   This was a rapist who had

7   committed several rapes and had a diagnosis of being a sexual sadist.  His sexual assault

8   criminal history was not sudden: he committed his sexual assaults over more than six years.

9   Cf. Lawrence, 44 Cal. 4th 1181 (upholding release of prisoner with no criminal history who

10   committed murder "while she was experiencing an unusual amount of stress arising from

11   circumstances not likely to recur"); Hayward, 603 F.3d at 569-70 (Berzon, J. concurring)

12   (parole applicant had a "long history of violence and criminal activity" pre-dating the

13   commitment offense; "[a]s in Shaputis, these circumstances reasonably establish that the

14   attack was *not* committed during a period of 'emotional stress that was unusual or unlike to

15   recur.'").  Oliver's sexual sadism was in remission, but the psychiatrist left open the

16   possibility that remission might have been due to the lack of access to women to victimize

17   while he was in prison rather than his personal growth.  Also, Oliver answered some

18   questions on a test for the psychiatrist that showed cognitive distortions about rape behavior

19   that were cause for concern to the psychiatrist.   And some of Oliver's statements to

20   questions at the hearing indicated he might have difficulty simply accepting a rejection from

21   a woman and appeared to think that a better strategy would be to be persistent in questioning

22   her decision.  See RT 83-84, 93.[2]  The prisoner's educational, employment and in-prison

23   behavior – while very favorable -- have little connection with the sexual sadism concern.

24   Also, his very lengthy incarceration and his extensive self-help and therapy programming

25   count in his favor, but they do not erase this area of concern about his potential danger to

26   women.  Cf. Shaputis, 44 Cal. 4th at 1259-60 (upholding unsuitability determination for

27   prisoner who, despite favorable  programming and prison behavior, still had not gained

28   insight into his domestic violence and murder of his wife). The Governor's reasons and

11

1   reasoning were sound and pass constitutional muster.  Applying the "some evidence" test

2   here, the court concludes that Oliver is not entitled to habeas relief.

3   D.      Certificate Of Appealability

4           A certificate of appealability will not issue. See 28 U.S.C. § 2253(c).  This is not a

5   case in which "reasonable jurists would find the district court's assessment of the

6   constitutional claims debatable or wrong."  Slack v. McDaniel, 529 U.S. 473, 484 (2000).

7   Jurists of reason would not find debatable or wrong that the decision that the state court

8   reasonably applied California's "some evidence" requirement in upholding the denial of

9   parole, and reasonably determined the facts in light of the evidence presented.  See Hayward,

10  603 F.3d at 562-63.

11                                          **CONCLUSION**

12          For the foregoing reasons, the petition is denied on the merits.  The clerk shall close

13  the file.

14          IT IS SO ORDERED.

15  DATED: September 9, 2010

16                                          Marilyn Hall Patel
                                            United States District Judge

17

18

19

20

21

22

23

24

25

26

27

28

# NOTES

1.      Specifically, when the "Bumby Cognitive Distortion Scale: The Rape Scale" test was administered, Oliver expressed agreement with the following statements: (1) "Men who commit rape are probably responding to a lot of stress in their lives, and raping helps to reduce that stress." (2) "If a woman does not resist strongly to sexual advances, she is probably willing to have sex." (3) "Women who go to bars a lot are mainly looking to have sex." (4) "If a person tells himself that he will never rape again, he probably won't."   Resp. Exh. 7 at 3.

At the hearing, Oliver changed his answers so that they were not in agreement with these statements. However, that change is of little value, given that the new answers basically were coached in that he was first told he had given answers that concerned the psychiatrist. See RT 84.

2.      A commissioner noted that many of his past sexual assault occurred after Oliver was rejected and got mad. The commissioner noted Oliver would face rejection again in his life and asked, "How do you handle that now?" Oliver responded: "Well, I'm pretty good at handling it. I can walk away from it. I can say what's on my mind now. I can resolve the situation by asking questions. Through the years, the past 35 years, I received a lot of rejection. I received disappointments. I have never acted out because I learned how to not act out. I know how to just resolve the situation, not to walk away from it." RT 83-84.

Later, Oliver was asked how he would react if his wife tried to break up with him because she decided the relationship just didn't work for her. Oliver responded:

    [Oliver: ] If I was to take on that first I would ask questions why? What have I done? If she is persistent with just breaking up I would constantly try to resolve the problem. I would try to talk to her if I can. I (indiscernible), that then try to make amends and come back to her later again and try to find out what was the problem. Is it something that I've done, that I need to be aware of? I would basically ask questions.

    Presiding Commissioner St. Julien: Okay. At what point would you leave her alone??

    Inmate Oliver: To the point where she said, no, my mind is made up. And then I would leave. I wouldn't respond. I would just give her time to cool down. I would come back to her later and ask the same question. If I can't get it, no type of answer for me, I would have to step back for a while and let her make a decision that she wants to do. But at anytime I won't reach violently or use verbal words, because verbal words is being violent anyway.

RT 93.